## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| LKQ CORPORATION, and | ) | Case No. 21-3166 |
| KEYSTONE AUTOMOTIVE | ) | |
| INDUSTRIES, INC. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| KIA MOTORS AMERICA, Inc., and | ) | |
| KIA MOTORS CORPORATION | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT OF PATENT NON-INFRINGEMENT AND INVALIDITY

Plaintiffs LKQ Corporation and Keystone Automotive Industries, Inc. ("LKQ" or "Plaintiffs"), by its attorneys Irwin IP LLC, seek declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 against Defendants Kia Motors America, Inc. and Kia Motors Corporation ("Kia" or "Defendants") and allege as follows:

### PARTIES

1.      Plaintiff LKQ Corporation is a corporation organized and existing under the laws of the State of Delaware with its corporate office located at 500 W. Madison Street, Suite 2800, Chicago, Illinois 60661.  LKQ Corporation, by and through its subsidiaries, imports and sells, among other items, commercially successful automotive replacement and repair parts throughout the United States and in this District.

2.      Plaintiff Keystone Automotive Industries, Inc. ("Keystone") is a corporation organized and existing under the laws of the State of California with its corporate office located at 500 W. Madison Street, Suite 2800, Chicago, Illinois 60661.  Keystone is a subsidiary of LKQ

Corporation, and distributes aftermarket automotive replacement parts throughout the United States and in this District.

3.      Defendant Kia Motors America is a corporation duly organized and existing under the laws of the State of California, with its principal place of business located in 111 Peters Canyon Road, Irvine, CA 92606.  On information and belief, Kia Motors America is a wholly-owned subsidiary of Kia Motors Corporation.

4.      Kia Motors Corporation is a Korean company located in Seoul, Republic of Korea. Kia Motors Corporation manufactures and sells automobiles and automobile parts under the Kia brand.  Kia Motors Corporation is the owner of the design patents at issue in this complaint.

## NATURE OF THE ACTION

5.      This is a declaratory judgment action seeking a determination that U.S. Patent Nos. D635,701 (the "'701 Patent"); D720,873 (the "'873 Patent"); D749,757  (the "'757 Patent"); D792,989  (the "'989 Patent"); D705,963 (the "'963 Patent"); D749,762  (the "'762 Patent"); D714,975  (the "'975 Patent"); D714,977  (the "'977 Patent"); and D714,976 (the "'976 Patent") (collectively, "Invalid Patents") are invalid as anticipated or obvious over the prior art and purport to cover unpatentable subject matter.

6.      This declaratory judgment action also seeks a determination that U.S. Patent Nos. D592,773  (the "'773 Patent"); D709,218  (the "'218 Patent"); D709,219  (the "'219 Patent"); D650,931  (the "'931 Patent"); D749,757  (the "'757 Patent"); D705,963 (the "'963 Patent"); D714,977  (the "'977 Patent"); and D728,135  (the "'135 Patent") (collectively, "Non-Infringed Patents") are not infringed.

7.      This action arises from affirmative measures taken by Kia to interfere with LKQ's business operations by asserting that vehicle parts distributed by LKQ infringe the Kia's Patents-

2

in-Suit. Exhibit 1.

## HISTORICAL CONTEXT

8.      The automotive "aftermarket" industry generally consists of the market for replacement parts, accessories, and services for repairing or replacing the "original equipment" included in an automobile when it was first sold by the original equipment manufacturer ("OEM"). Aftermarket replacement parts are newly manufactured parts designed to replace damaged or worn original equipment parts in order to return the vehicle to its original condition, as the vast majority of those seeking to repair their vehicle desire their vehicle to be returned to its original condition in the event it has been damaged or otherwise become worn.

9.      The automotive aftermarket industry, including that aspect of the industry consisting of replacement parts made and offered by third parties unaffiliated with the OEM to replace damaged or worn original equipment parts, is almost as old as the automobile itself, and has served automobile owners as a crucial source for replacement parts for over a century. On information and belief, the modern automotive aftermarket industry traces its origins to the formation of the Motor and Accessory Manufacturers Association in 1904, forty years before Kia Motors Corporation was founded and eighty-eight years before Kia Motors America, Inc. was founded, and has been furnishing essential parts and services to automobile owners across America ever since. On information and belief, the United States' automotive aftermarket industry generates over $400 billion in annual revenue and employs approximately 4.7 million people.

10.      Throughout its history, the aftermarket industry has enabled American automobile owners to fully realize the value of their automotive investments by providing access to critical and affordable replacement parts. Due to the substantial value of any given automobile as a whole, an automobile can—and would be expected to—survive the lifespan of many of its constituent

components, thus necessitating replacement of those parts that wear out or are damaged. However, each automobile model is manufactured differently, and a part built for a given manufacturer's automobile would typically not fit another automobile model from the same manufacturer, much less those built by a different manufacturer. Thus, in the absence of aftermarket replacement parts, there would only be a single source for replacement parts for a given automobile model: the OEM, rendering each vehicle model a miniature monopoly market unto itself. With no competition to exert downward pressure on prices and with owners locked in by their initial purchases, automakers would be free to charge whatever price would maximize their own profits. Vehicle owners would be forced to either pay the OEM's price, extract and reuse parts from scrapped automobiles of the same model if such parts are available in acceptable condition (a different proposition than new aftermarket parts), make do with mismatched replacement parts (which would have to be forced to fit via extensive and costly modification and unacceptable in any conceivable marketplace), or do without entirely, depreciating the value of their substantial investment in, and the utility of, the vehicle. By providing automobile owners with a non-OEM source of replacement parts for their automobiles, the aftermarket industry has historically injected crucial competition into what would otherwise be a captive and monopolized market, exerting downward pressure on prices, and forcing OEMs to offer replacement parts for relatively lower prices. Throughout substantially the entirety of automotive history, the aftermarket industry has provided not only the grease that keeps the gears smoothly turning, but often the gears as well.

11.     In the mid-to-late 2000s, OEMs began to zero in on design patents as an avenue not only for protecting their whole vehicle designs from competing automakers (a legitimate use of such intellectual property), but for monopolizing the replacement parts market for their vehicles by obtaining design patents for individual exterior parts. OEMs then brought these patents to bear

4

against the aftermarket industry via what Congresswoman Zoe Lofgren described during a March 22, 2010, House Judiciary Committee hearing as "creative enforcement" of that intellectual property. Design Patents and Auto Replacement Parts, Hearing Before the H. Comm. on the Judiciary, 111th Cong. (2010). Throughout this effort, the OEMs sought to brand this dispute—a bid to seize monopoly revenue—in misleading moralistic terms. Specifically, OEMs began describing the venerable aftermarket replacement parts industry participants, which had for a century supported their customers and breathed value into their products, as "unscrupulous" despite the inherent absurdity, in context, of such a characterization (a dissonance noted by the House Judiciary Committee at the time).

12. Tellingly, Kia's runaway patent acquisition practices clamp down not on derivative designs of its vehicle, but on aftermarket industry competition in the replacement parts market. Kia's goal is to lock Kia vehicle owners into purchasing only those replacement parts that Kia allows them to use for the fifteen-year term of Kia's design patents.

13. By thus capturing the market, Kia opens the door to extract ever-increasing premiums from their customers after locking them in with the initial sale without any notice to consumers at the time of sale of the patent strategy designed to eliminate consumer choice. This strategy is designed to elevate Kia's profits at the expense of elevating consumers' costs of maintaining Kia vehicles, increasing insurance costs, and increasing the rate at which Kia vehicles would be declared total losses upon suffering collision damage that would otherwise be reparable. All of these harms flow from Kia's invalid application of design patents: as shown and alleged herein, Kia has asserted patents that are invalid over the prior art and has stretched others well beyond their appropriate scope.

## JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction over this action and the matters pleaded herein under 28 U.S.C. §§ 1331 and 1338(a) because the action arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, and the Patent Act of the United States, 35 U.S.C. § 101, *et seq.*

15.     This Court has personal jurisdiction over Defendants because, on information and belief, Defendants have continuous and systematic contacts with the state of Illinois and this Judicial District, have affirmatively directed infringement accusations at LKQ in this Judicial District, and Defendants' submission to personal jurisdiction would be fair and reasonable.

16.     Venue against Defendants is proper because a substantial part of the events or omissions giving rise to the claim occurred in this Judicial District and Defendants are subject to personal jurisdiction in this Judicial district.  28 U.S.C. § 1391(b)(2) and (3).

## STANDING

17.     For many decades, LKQ and its predecessors, and others in a vast aftermarket parts industry, have been offering for sale replacement automotive parts including head lights, tail lights, and more.  LKQ's business model in the United States automotive repair parts market is to be a comprehensive source of all automotive body repair parts for its customers.  Thus, its general practice is and has been to offer nearly every, if not every, automotive body repair part for virtually every mainstream vehicle model available unless doing so would be in violation of law (such as if a part were covered by a valid and unlicensed patent).

18.     LKQ products are of a consistently high quality; LKQ carefully monitors its parts production with the objective that all replacement parts meet or exceed the quality of the OEM

part it replaces.  Due to its long-standing presence in the aftermarket industry and its reputation for quality, LKQ has become a national leader among replacement part providers.

19.     On January 20, 2021, Kia sent a letter to LKQ (the "January 20 Kia Letter") listing the Patents-in-Suit and LKQ's products that allegedly infringe the patents, and effectively accused LKQ of infringing those design patents.  Exhibit 1.  LKQ does not believe that it infringes any Kia patent.

20.     LKQ has sold and currently offers for sale all of the parts Kia accuses of patent infringement.  But for some of them, LKQ is selling refurbished parts originally manufactured by Kia.  LKQ's re-sale of refurbished Kia parts cannot constitute infringement pursuant to the doctrine of patent exhaustion.

21.     LKQ intends to sell parts that it believes in good faith do not infringe any Kia patent, such as those parts implicated by this complaint.  LKQ has initiated this action in furtherance of its intent to sell and to continue to sell the implicated parts in the United States.

22.     By virtue of the foregoing, a substantial controversy exists between the parties that is of sufficient immediacy and concreteness to warrant declaratory relief.

## GENERAL ALLEGATIONS

23.     The January 20 Kia Letter identified a number of automotive parts sold by LKQ, that allegedly correspond to the following Kia design patents:

| LKQ Catalog Part No. | Kia Design Patent |
|---|---|
| KI2503141OE | D592,773 |
| KI2503171R | D709,218 |
| KI25037100E | D709,219 |
| KI2503157C | D635,701 |
| KI2803104C | D720,873 |
| KI2805117C | D749,757 |
| KI2802107C | D792,989 |
| KI2805111C | D705,963 |
| KI2803108C | D749,762 |
| KI2503152OE | D650,931 |
| KI2503167C | D714,975 |
| KI2503168C | D7 14,977 |
| KI2801141C | D714,976 |
| KI25031840E | D728,135 |

Images of the LKQ parts that correspond to the above-listed LKQ part numbers are set forth below.

Each of the below-depicted parts is currently being sold by LKQ domestically or internationally, and was asserted by Kia to infringe its design patents. Thus, each of the LKQ parts is compared in the table below with the correspondingly referenced Kia Design Patents-in-Suit:[1]

---

[1] Images of the reconditioned/repaired parts or parts manufactured by OEM and the corresponding Kia design patents are not included because they do not constitute infringement due to the doctrine of patent exhaustion.

8

| LKQ Catalog | Kia Design Patent |
|---|---|
| KI2503141OE<br>(MANUFACTURED BY OEM) | D592773<br>N/A |
| KI2503171R<br>(SOLD AS RECONDITIONED) | D709218<br>N/A |
| KI25037100E<br>(MANUFACTURED BY OEM) | D709219<br>N/A |
| KI2503157C<br> | D635701<br> |
| KI2803104C<br> | D720873<br> |

| KI2805117C | D749757 |
| --- | --- |
| KI2802107C | D792989 |
| KI2805111C | D705963 |





| KI2803108C | D749762 |
| KI2503152OE (MANUFACTURED BY OEM) | D650931 N/A |
| KI2503167C | D714975 |
| KI2503168C | D714977 |

11



| KI2801141C | D714976 |
|------------|---------|
| KI2503184OE<br>(MANUFACTURED BY OEM) | D728135<br>N/A |

24.     Each of the Patents-in-Suit is assigned to Kia Motor Company.

**NON-INFRINGEMENT ALLEGATIONS – THE '773 PATENT**

25.     The '773 Patent was filed in the United States on November 14, 2008, claiming priority to a Korean application filed on July 14, 2008.  *See* Exhibit 2.  The '773 Patent issued on May 19, 2009.

26.     The '773 Patent claims "[t]he ornamental design for a vehicle head lamp, as shown and described."

27.     LKQ does not infringe the '773 patent because LKQ only sold parts that were manufactured by an OEM, not replicas.

28.     Thus, LKQ does not infringe the '773 Patent.

**NON-INFRINGEMENT ALLEGATIONS – THE '218 PATENT**

29.     The '218 Patent was filed in the United States on October 9, 2012, claiming priority to a Korean application filed on April 18, 2012.  *See* Exhibit 3.  The '218 Patent issued on July 15, 2014.

30.     The '218 Patent claims "[t]he ornamental design for a headlamp for an automobile, as shown and described."

31.     LKQ does not infringe the '218 patent because LKQ only sold reconditioned/repaired salvage parts, not replicas.

## NON-INFRINGEMENT ALLEGATIONS – THE '219 PATENT

32.     The '219 Patent was filed in the United States on October 9, 2012, claiming priority to a Korean application filed on April 18, 2012.  *See* Exhibit 10.  The '219 Patent issued on July 15, 2014.

33.     The '219 Patent claims "[t]he ornamental design for a headlamp for an automobile, as shown and described."

34.     LKQ does not infringe the '219 patent because LKQ only sold parts that were manufactured by an OEM, not replicas.

## NON-INFRINGEMENT ALLEGATIONS – THE '757 PATENT

35.     The '757 Patent was filed in the United States on August 5, 2014, claiming priority to a Korean application filed on March 27, 2014.  *See* Exhibit 4.  The '757 Patent issued on February 16, 2016.

36.     The '757 Patent claims "[t]he ornamental design for a rear lamp for an automobile, as shown and described."

37.     The below comparison illustrates the alleged infringing part compared to the alleged Kia design patent:

13

| **LKQ Part** KI2805117C | **Kia Design Patent** D749,757 |
|---|---|
|  EX. 35 | Ex. 4, FIG. 2 |

38. LKQ does not infringe Kia's '757 Patent because an ordinary observer would not be confused into thinking that the design of the part and the design covered by the '757 Patent are substantially similar.

39. At a minimum, and by way of example, the part produced by LKQ does not have the claimed extra element on the left of the light.

40. Thus, LKQ does not infringe the '757 Patent.

## NON-INFRINGEMENT ALLEGATIONS – THE '963 PATENT

41. The '963 Patent was filed in the United States on September 25, 2012, claiming priority to a Korean application filed on May 30, 2012. *See* Exhibit 5. The '963 Patent issued on October 13, 2015.

42. The '963 Patent claims "[t]he ornamental design for a rear combination lamp for an automobile, as shown and described."

43. The below comparison illustrates the alleged infringing part compared to the alleged Kia design patent:

| **LKQ Part** KI2805111C | **Kia Design Patent** D705963 |
|:---:|:---:|
|  |  |
| Ex. 6 | Ex. 5, FIG 2 |

44.     LKQ does not infringe Kia's '963 Patent because an ordinary observer would not be confused into thinking that the design of the part and the design covered by the '963 Patent are substantially similar.

45.     At a minimum, and by way of example, the part produced by LKQ does not have the claimed extra element on the left of the light.

46.     Thus, LKQ does not infringe the '963 Patent.

**NON-INFRINGEMENT ALLEGATIONS – THE '931 PATENT**

47.     The '931 Patent was filed in the United States on May 18, 2011, claiming priority to a Korean application filed on January 17, 2012.  *See* Exhibit 7.  The '931 Patent issued on December 20, 2011.

48.     The '931 Patent claims "[t]he ornamental design for a head lamp for automobiles, as shown and described."

49.     LKQ does not infringe the '931 patent because LKQ only sold parts that were manufactured by an OEM, not replicas.

15

## NON-INFRINGEMENT ALLEGATIONS – THE '977 PATENT

50.     The '977 Patent was filed in the United States on June 7, 2013, claiming priority to a Korean application filed on February 21, 2013.  *See* Exhibit 8.  The '977 Patent issued on October 7, 2014.

51.     The '977 Patent claims "[t]he ornamental design for a head lamp for automobiles, as shown and described."

52.     The below comparison illustrates the alleged infringing part compared to the alleged Kia design patent:



| LKQ Part KI2503168C | Kia Design Patent D714977 |
|:---:|:---:|
| Ex. 9 | Ex. 8 |

53.     LKQ does not infringe Kia's '977 Patent because an ordinary observer would not be confused into thinking that the design of the part and the design covered by the '977 Patent are substantially similar.

54.     At a minimum, and by way of example, the part produced by LKQ does not have a series of "dots" at the upper portion of the assembly as claimed in the '977 Patent.

55.     Thus, LKQ does not infringe the '977 Patent.

## NON-INFRINGEMENT ALLEGATIONS – THE '135 PATENT

56.     The '135 Patent was filed in the United States on May 18, 2011, claiming priority to a Korean application filed on January 17, 2011.  *See* Exhibit 11.  The '135 Patent issued on December 20, 2011.

57.     The '135 Patent claims "[t]he ornamental design for a head lamp for automobiles, as shown and described."

58.     LKQ does not infringe the '135 patent because LKQ only sold parts that were manufactured by an OEM, not replicas.

## INVALIDITY ALLEGATIONS – THE '701 PATENT

59.     The '701 Patent is invalid, at a minimum, as obvious over the prior art.

60.     At a minimum, and by way of example, the '701 Patent is obvious over U.S. Design Patent D560,291 in light of Y.S. Design Patent D583,085.

61.     D560,291 is a reference that is basically the same as the claimed design of the '701 Patent.  The below chart compares exemplary images of D560,291 to the claimed design of the '701 Patent:

| '701 PATENT | D560,291 |
|---|---|
|  | 

Ex. 13, FIG 1 |

17



| Ex. 12, FIG 7 | |
|---|---|
| Ex. 12, FIG. 1 | Ex. 13, FIG 2 |

62.    D560,291 has a priority date of December 21, 2006, and thus constitutes prior art under at least 35 U.S.C. § 102(b).

63.    Any difference between the '474 Patent and D560,291 is suggested by the secondary reference, the D583,085 patent.  *See* Exhibit 14.

64.    The appearance of the D583,085 patent's claim is so related to D560,291 that the appearance of features in one would suggest the application to the other:

| **D560,291** | **D583,085** |
|---|---|
| Ex. 13, FIG 1 | Ex. 14, FIG 1 |



| | |
|---|---|
| Ex. 13, FIG 2 | Ex. 14, FIG 2 |

65.     The headlight of D560,291 has a similar overall shape as the D583,085 patent's claimed design.

66.     The priority date of the D583,085 patent is July 8, 2008, and it thus constitutes prior art under at least 35 U.S.C. § 102(b).

67.     The features of D560,291 combined with the D583,085 patent would create a design with substantially the same overall visual appearance as the '701 Patent.

68.     Given the relatedness in designs, an ordinary designer would have been motivated to combine D560,291 with the D583,085 patent to arrive at a design that is substantially the same as the claimed design of the '701 Patent.

69.     Thus, the '701 Patent is invalid, at a minimum, as obvious.

## INVALIDITY ALLEGATIONS – THE '873 PATENT

70.     The '873 Patent is invalid, at a minimum, as obvious over the prior art.

71.     At a minimum, and by way of example, the '873 Patent is obvious over D635,697 in light of the 2013 Hyundai I30 Hatchback.

19

72.     D635,697 is a reference that is basically the same as the claimed design of the '873 Patent.  The below chart compares exemplary images of the D635,697 to the claimed design of the '873 Patent:

| **'873 PATENT** | **D635,697** |
|---|---|
|   Ex. 15, FIG 1 |   Ex. 16, FIG 1 |
|   Ex. 15, FIG. 2 |   Ex. 16, FIG 2 |

73.     The priority date of D635,697 is March 30, 2010, and it thus constitutes prior art under at least 35 U.S.C. § 102(a)(1).

74.     Any difference between the '873 Patent and D635,697 is suggested by the secondary reference, the 2013 Hyundai i30 Hatchback.  *See* Exhibit 17.

20

75. The appearance of the 2013 Hyundai i30 Hatchback is so related to D635,697 that the appearance of features in one would suggest the application to the other:

| D635,697 | 2013 HYUNDAI i30 HATCHBACK |
|---|---|
|  Ex. 16, FIG 2 | Ex. 17 |

76. The light assembly design of D635,697 has a similar overall shape as the 2013 Hyundai i30 Hatchback.

77. 2013 Hyundai i30 Hatchback was publicly available, sold, and purchased by consumers and images of the 2013 Hyundai i30 Hatchback were publicly available at least as early as 2013, and it thus constitutes prior art under at least 35 U.S.C. § 102(a)(1).

78. The features of D635,697 combined with the 2013 Hyundai i30 Hatchback would create a design with substantially the same overall visual appearance as the '873 Patent.

79. Given the relatedness in designs, an ordinary designer would have been motivated to combine D635,697 with the 2013 Hyundai i30 Hatchback to arrive at a design that is substantially the same as the claimed design of the '873 Patent.

80. Thus, the '873 Patent is invalid, at a minimum, as obvious.

21

### INVALIDITY ALLEGATIONS – THE '757 PATENT

81.     The '757 Patent is invalid, at a minimum, as obvious over the prior art.

82.     At a minimum, and by way of example, the '757 Patent is obvious over Chinese Design No. 3486724 in light of D641,506.

83.     Chinese Design No. 3486724 is a reference that is basically the same as the claimed design of the '757 Patent.  The below chart compares exemplary images of Chinese Design No. 3486724 to the claimed design of the '757 Patent:



| '757 PATENT | CHINESE DESIGN NO. 3486724 |
|:---:|:---:|
| Ex. 4, FIG 1 | Ex. 18 |
| | Ex. 19, FIG 1 |

| Ex. 4, FIG. 2 | |
|---|---|

84.    Chinese Design No. 3486724 was publicly available at least as early as November 16, 2005, and it thus constitutes prior art under at least 35 U.S.C. § 102(a)(1).

85.    Any difference between the '757 Patent and Chinese Design No. 3486724 is suggested by the secondary reference, D641,506.  *See* Exhibit 19.

86.    The appearance of the claimed design of D641,506 is so related to the claimed design of Chinese Design No. 3486724 that the appearance of features in one would suggest the application to the other:

| CHINESE DESIGN NO. 3486724 | D641,506 |
|---|---|
|  Ex. 18 |  Ex. 19, FIG 1 |
|  Ex. 18 |  Ex. 19, FIG 2 |

23

87.     The light of Chinese Design No. 3486724 has a similar overall shape as the D641,506.

88.     The D641,506 patent has a priority date of September 17, 2010, and it thus constitutes prior art under at least 35 U.S.C. § 102(a)(1).

89.     The additional features of Chinese Design No. 3486724 combined with D641,506 would create a design with substantially the same overall visual appearance as the '757 Patent.

90.     Given the relatedness in designs, an ordinary designer would have been motivated to combine Chinese Design No. 3486724 with D641,506 to arrive at a design that is substantially the same as the claimed design of the '757 Patent.

91.     Thus, the '757 Patent is invalid, at a minimum, as obvious.

## INVALIDITY ALLEGATIONS – THE '989 PATENT

92.     The '989 Patent is invalid, at a minimum, as obvious over the prior art.

93.     At a minimum, and by way of example, the '989 Patent is obvious over the European Design No. 002116608-0001 in light of the Korean Design No. 3004668500001.

94.     The European Design No. 002116608-0001 is a reference that is basically the same as the claimed design of the '989 Patent.  The below chart compares exemplary images of the European Design No. 002116608-0001 to the claimed design of the '989 Patent:

| '989 PATENT | EUROPEAN DESIGN NO. 002116608-0001 |
|---|---|
|  Ex. 20, FIG. 1 |  Ex. 21 |
|  Ex. 20, FIG. 2 |  Ex. 21 |

95.     The European Design No. 002116608-0001 has a priority date of October 15, 2012, and it thus constitutes prior art under at least 35 U.S.C. § 102(a)(1).

96.     Any difference between the '989 Patent and the European Design No. 002116608-0001 is suggested by the secondary reference, the Korean Design No. 3004668500001.  *See* Exhibit 22.

25

97.     The appearance of the taillight of the Korean Design No. 3004668500001 concept is so related to the European Design No. 002116608-0001 that the appearance of features in one would suggest the application to the other:



| EUROPEAN DESIGN NO. 002116608-0001 | Korean Design No. 3004668500001 |
|---|---|
| Ex. 21 | Ex. 22 |
| Ex. 21 | Ex. 22 |

98.     The Korean Design No. 3004668500001 has a priority date of October 24, 2007, and it thus constitutes prior art under at least 35 U.S.C. § 102(a)(1).

99.     The features of the European Design No. 002116608-0001 combined with the Korean Design No. 3004668500001 would create a design with substantially the same overall visual appearance of the '989 Patent.

26

100.     Given the relatedness in designs, an ordinary designer would have been motivated to combine the European Design No. 002116608-0001 with the Korean Design No. 3004668500001 to arrive at a design that is substantially the same as the claimed design of the '989 Patent.

101.     Thus, the '989 Patent is invalid, at a minimum, as obvious.

## INVALIDITY ALLEGATIONS – THE '963 PATENT

102.     The '963 Patent is invalid, at a minimum, as obvious over the prior art.

103.     At a minimum, and by way of example, the '963 Patent is obvious over the D604,874 patent in light of the 2008 Jeep EV Concept.

104.     The D604,874 patent is a reference that is basically the same as the claimed design of the '003 Patent.  The below chart compares exemplary images of the D604,874 patent to the claimed design of the '963 Patent:

| '963 PATENT | D604,874 |
|---|---|
|  Ex. 5, FIG. 1 |  Figure 2 <br> Ex. 23, FIG 2 |
|  Ex. 5, FIG. 2 |  Ex. 23, FIG 1 |

105. The priority date of the D604,874 patent is June 25, 2008, and it thus constitutes prior art under at least 35 U.S.C. § 102(b).

106. Any difference between the '003 Patent and the D604,874 patent is suggested by the secondary reference, the 2008 Jeep EV Concept. *See* Exhibit 24.

107. The appearance of the light of the 2008 Jeep EV Concept is so related to the D604,874 patent that the appearance of features in one would suggest the application to the other:

28

| D604,874 | 2008 JEEP EV CONCEPT |
|---|---|
| <br>Ex. 23, FIG 2 | <br>Ex. 24 |
| <br>Ex. 23, FIG 1 | <br>Ex. 24 |

108.    The 2008 Jeep EV Concept was publicly available and images of the 2008 Jeep EV Concept were publicly available at least as early as 2008, and it thus constitutes prior art under at least 35 U.S.C. § 102(a) and 102(b).

109.    The features of the D604,874 combined with the 2008 Jeep EV Concept would create a design with substantially the same overall visual appearance as the '963 Patent.

110.    Given the relatedness in designs, an ordinary designer would have been motivated to combine the D604,874 patent with 2008 Jeep EV Concept to arrive at a design that is substantially the same as the claimed design of the '963 Patent.

111.    Thus, the '963 Patent is invalid, at a minimum, as obvious.

29

## <u>INVALIDITY ALLEGATIONS – THE '762 PATENT</u>

112.     The '762 Patent is invalid, at a minimum, as obvious over the prior art.

113.     At a minimum, and by way of example, the '762 Patent is obvious over the 2011 Audi A1 in light of the D656,637 patent.

114.     The 2011 Audi A1 is a reference that is basically the same as the claimed design of the '762 Patent.  The below chart compares exemplary images of the 2011 Audi A1 to the claimed design of the '762 Patent:



| '762 PATENT | 2011 AUDI A1 |
|:---:|:---:|
| Ex. 25, FIG. 1 | Ex. 26 |
| Ex. 25, FIG. 2 | Ex. 26 |

115.    The 2011 Audi A1 was publicly available, sold, and purchased by consumers and images of the 2011 Audi A1 were publicly available at least as early as 2011, and it thus constitutes prior art under at least 35 U.S.C. § 102(a)(1).

116.    Any difference between the '762 Patent and the 2011 Audi A1 is suggested by the secondary reference, D656,637 patent.  *See* Exhibit 27.

117.    The appearance of the taillight of D656,637 patent is so related to the 2011 Audi A1 that the appearance of features in one would suggest the application to the other:

| 2011 AUDI A1 | D656,637 |
|:---:|:---:|
|  Ex. 26 | Ex. 27, FIG 2 |

118.     D656,637 patent has a priority date of March 31, 2011, and it thus constitutes prior art under at least 35 U.S.C. § 102(a)(1).

119.     The features of the 2011 Audi A1 combined with the D656,637 patent would create a design with substantially the same overall visual appearance as the '762 Patent.

120.     Given the relatedness in designs, an ordinary designer would have been motivated to combine the 2011 Audi A1 with D656,637 patent to arrive at a design that is substantially the same as the claimed design of the '762 Patent.

121.     Thus, the '762 Patent is invalid, at a minimum, as obvious.

### INVALIDITY ALLEGATIONS – THE '975 PATENT

122.     The '975 Patent is invalid, at a minimum, as obvious over the prior art.

123.     At a minimum, and by way of example, the '975 Patent is obvious over the 2012 Kia Trackster Concept in light of D631,583 patent.

124.    The 2011 Hyundai Sonata is a reference that is basically the same as the claimed design of the '975 Patent.  The below chart compares exemplary images of the 2012 Kia Trackster Concept to the claimed design of the '975 Patent:



| '975 PATENT | 2012 KIA TRACKSTER CONCEPT |
|---|---|
| Ex. 30, FIG. 1 | Ex. 29 |
| Ex. 30, FIG. 2 | Ex. 29 |

125.    The 2012 Kia Trackster Concept was publicly available and images of the 2012 Kia Trackster Concept were publicly available at least as early as 2012, and it thus constitutes prior art under at least 35 U.S.C. § 102(a).

33

126.    Any difference between the '975 Patent and 2012 Kia Trackster Concept is suggested by the secondary reference, D631,583 patent. *See* Exhibit 28.

127.    The appearance of the light of D631,583 patent is so related to the 2012 Kia Trackster Concept that the appearance of features in one would suggest the application to the other:

| **2012 Kia Trackster Concept** | **D631,583 patent** |
| --- | --- |



| Ex. 29 | Ex. 28 |
| Ex. 29 | Ex. 28 |

128.    The priority date of the D631,583 patent is July 22, 2009, and it thus constitutes prior art under at least 35 U.S.C. § 102(a)(1).

129. The features of the 2012 Kia Trackster Concept combined with the D631,583 patent would create a design with substantially the same overall visual appearance as the '975 Patent.

130. Given the relatedness in designs, an ordinary designer would have been motivated to combine the 2012 Kia Trackster Concept with D631,583 patent to arrive at a design that is substantially the same as the claimed design of the '975 Patent.

131. Thus, the '975 Patent is invalid, at a minimum, as obvious.

## INVALIDITY ALLEGATIONS – THE '977 PATENT

132. The '977 Patent is invalid, at a minimum, as obvious over the prior art.

133. At a minimum, and by way of example, the '977 Patent is obvious over the D573,275 patent in light of the 2012 Kia Trackster Concept.

134. The D573,275 patent is a reference that is basically the same as the claimed design of the '977 Patent. The below chart compares exemplary images of the D573,275 patent to the claimed design of the '977 Patent:

| '977 PATENT | D573,275 |
|---|---|
| <br>Ex. 8, FIG. 1 | <br>FIG. 1<br><br>Ex. 31 |
| <br>Ex. 8, FIG. 2 | <br>FIG. 2<br><br>Ex. 31 |

135.    The D573,275 patent's priority date is December 14, 2006, and it thus constitutes prior art under at least 35 U.S.C. § 102(b).

136.    Any difference between the '977 Patent and the D573,275 patent is suggested by the secondary reference, the 2012 Kia Trackster Concept.  *See* Exhibit 29.

36

137.    The appearance of the headlight of the 2012 Kia Trackster Concept is so related to the D573,275 patent that the appearance of features in one would suggest the application to the other:



| D573,275 | 2012 Kia Trackster Concept |
|---|---|
| FIG. 1 Ex. 31 | Ex. 29 |
| FIG. 2 Ex. 31 | Ex. 29 |

138.    The 2012 Kia Trackster Concept was publicly available and images of the 2012 Kia Trackster Concept were publicly available at least as early as 2012, and it thus constitutes prior art under at least 35 U.S.C. § 102(a)(1).

37

139. The features of the D573,275 patent combined with the 2012 Kia Trackster Concept would create a design with substantially the same overall visual appearance as the '977 Patent.

140. Given the relatedness in designs, an ordinary designer would have been motivated to combine the D573,275 patent with the 2012 Kia Trackster Concept to arrive at a design that is substantially the same as the claimed design of the '977 Patent.

141. Thus, the '977 Patent is invalid, at a minimum, as obvious.

## INVALIDITY ALLEGATIONS – THE '976 PATENT

142. The '976 Patent is invalid, at a minimum, as obvious over the prior art.

143. At a minimum, and by way of example, the '976 Patent is obvious over Chinese Design Registration No. 301797083 in light of Chinese Design Registration No. 301761989.

144. Chinese Design Registration No. 301797083 is a reference that is basically the same as the claimed design of the '976 Patent. The below chart compares exemplary images of Chinese Design Registration No. 301797083 to the claimed design of the '976 Patent:

| '976 PATENT | CHINESE DESIGN REGISTRATION NO. 301797083 |
|---|---|
| <br>Ex. 32, FIG. 1 | <br>Ex. 33 |
| <br>Ex. 32, FIG. 2 | <br>Ex. 33 |

145.     Chinese Design Registration No. 301797083 has a priority date of January 11, 2012, and it thus constitutes prior art under at least 35 U.S.C. § 102(b).

146.     Any difference between the '976 Patent and Chinese Design Registration No. 301797083 is suggested by the secondary reference, Chinese Design Registration No. 301761989. *See* Exhibit 34.

39

147.     The appearance of the tail light of Chinese Design Registration No. 301761989 is so related to Chinese Design Registration No. 301797083 that the appearance of features in one would suggest the application to the other:

| CHINESE DESIGN REGISTRATION NO. 301797083 | CHINESE DESIGN REGISTRATION NO. 301761989 |
|---|---|
|  Ex. 33 |  Ex. 34 |
|  Ex. 33 |  Ex. 34 |

148.     The Chinese Design Registration No. 301761989 has a priority date of December 14, 2011, and it thus constitutes prior art under at least 35 U.S.C. § 102(b).

40

149.    The features of the Chinese Design Registration No. 301797083 combined with Chinese Design Registration No. 301761989 would create a design with substantially the same overall visual appearance as the '976 Patent.

150.    Given the relatedness in designs, an ordinary designer would have been motivated to combine the Chinese Design Registration No. 301797083 with the Chinese Design Registration No. 301761989 to arrive at a design that is substantially the same as the claimed design of the '976 Patent.

151.    Thus, the '976 Patent is invalid, at a minimum, as obvious.

## INVALIDITY ALLEGATIONS – UNPATENTABLE COMPONENTS

152.    The Invalid Patents are invalid because they are designs applied to component parts that have no independent functionality, and therefore empower Kia with the ability to improperly subvert the exhaustion doctrine and prevent consumers from exercising their right to repair their own vehicles.

153.    Design patents are limited to "articles of manufacture."  35. U.S.C. § 171.

154.    The original meaning of an "article of manufacture" was an article that was complete in itself, and not a part or sub-part of something that needed further assembly to be functional.[2]

---

[2] LKQ believes that there is a non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law regarding the patentability of functionless component parts.  *See, e.g.*, Sarah Burstein, *The "Article of Manufacture" in 1887*, 32 BERKELEY TECH. L.J. 1 (2017), at 5, https://papers.ssrn.com/sol3/_papers.cfm?abstract_id=2850604 (in 1887, "article of manufacture" was a term of art that "referred to a tangible item made by humans—*other than* a machine or composition of matter—that had a unitary structure and *was complete in itself* for use or for sale").

155. The Invalid Patents are design patents for the ornamental designs of vehicle lights. These are minor sub-parts of a larger item, the entire vehicle.

156. Patents on these sub-parts contravene the consumer's right to repair their own vehicle. The consumer has already purchased a vehicle embodying the design patent for the lights, and so the consumer also has the right to repair the article that she has paid for, as long as she is not reconstructing a new patented article.

157. As the Invalid Patents are not designs for "articles of manufacture," but an impermissible attempt to circumvent patent exhaustion and the consumer's right to repair her vehicle, these patents should be found invalid.

## COUNT I– NON-INFRINGEMENT OF THE '773 PATENT

158. LKQ realleges and incorporates all preceding paragraphs as if fully set forth herein.

159. LKQ does not infringe the '773 Patent because the part that LKQ sells is a part that was manufactured by an OEM, therefore LKQ is immune from a claim of infringement under the doctrine of patent exhaustion.

160. As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that LKQ does not infringe the claim of the '773 Patent.

## COUNT II– NON-INFRINGEMENT OF THE '218 PATENT

161. LKQ realleges and incorporates all preceding paragraphs as if fully set forth herein.

162. LKQ does not infringe the '218 Patent because the part that LKQ sells is a reconditioned/refurbished part and therefore immune from a claim of infringement under the doctrine of patent exhaustion.

163.    As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that LKQ does not infringe the claim of the '218 Patent.

### COUNT III– NON-INFRINGEMENT OF THE '219 PATENT

164.    LKQ realleges and incorporates all preceding paragraphs as if fully set forth herein.

165.    LKQ does not infringe the '219 Patent because the part that LKQ sells is a part that was manufactured by an OEM, therefore LKQ is immune from a claim of infringement under the doctrine of patent exhaustion.

166.    As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that LKQ does not infringe the claim of the '219 Patent.

### COUNT IV– NON-INFRINGEMENT OF THE '757 PATENT

167.    LKQ realleges and incorporates all preceding paragraphs as if fully set forth herein.

168.    LKQ does not infringe the '757 Patent because the part that LKQ produces is not within the scope of and does not infringe the claim of the '757 Patent.

169.    As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that LKQ does not infringe the claim of the '757 Patent.

### COUNT V– NON-INFRINGEMENT OF THE '963 PATENT

170.    LKQ realleges and incorporates all preceding paragraphs as if fully set forth herein.

171.    LKQ does not infringe the '963 Patent because the part that LKQ produces is not within the scope of and does not infringe the claim of the '963 Patent.

172.     As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that LKQ does not infringe the claim of the '963 Patent.

### COUNT VI– NON-INFRINGEMENT OF THE '931 PATENT

173.     LKQ realleges and incorporates all preceding paragraphs as if fully set forth herein.

174.     LKQ does not infringe the '931 Patent because the part that LKQ sells is a part that was manufactured by an OEM, therefore LKQ is immune from a claim of infringement under the doctrine of patent exhaustion.

175.     As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that LKQ does not infringe the claim of the '931 Patent.

### COUNT VII– NON-INFRINGEMENT OF THE '977 PATENT

176.     LKQ realleges and incorporates all preceding paragraphs as if fully set forth herein.

177.     LKQ does not infringe the '977 Patent because the part that LKQ produces is not within the scope of and does not infringe the claim of the '977 Patent.

178.     As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that LKQ does not infringe the claim of the '977 Patent.

### COUNT VIII– NON-INFRINGEMENT OF THE '135 PATENT

179.     LKQ realleges and incorporates all preceding paragraphs as if fully set forth herein.

180.     LKQ does not infringe the '135 Patent because the part that LKQ sells is a part that was manufactured by an OEM, therefore LKQ is immune from a claim of infringement under the doctrine of patent exhaustion.

44

181.    As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that LKQ does not infringe the claim of the '135 Patent.

### COUNT IX – INVALIDITY OF THE '701 PATENT

182.    LKQ realleges and incorporates all preceding paragraphs as if fully set forth herein.

183.    At a minimum, the claim of the '701 Patent is invalid as obvious over the prior art.

184.    The claim of the '701 Patent is further invalid because it is not an "article of manufacture," but rather a component part.

185.    As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that the claim of the '701 Patent is invalid.

### COUNT X – INVALIDITY OF THE '873 PATENT

186.    LKQ realleges and incorporates all preceding paragraphs as if fully set forth herein.

187.    At a minimum, the claim of the '873 Patent is invalid as obvious over the prior art.

188.    The claim of the '873 Patent is further invalid because it is not an "article of manufacture," but rather a component part.

189.    As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that the claim of the '873 Patent is invalid.

### COUNT XI – INVALIDITY OF THE '757 PATENT

190.    LKQ realleges and incorporates all preceding paragraphs as if fully set forth herein.

191.    At a minimum, the claim of the '757 Patent is invalid as obvious over the prior art.

192.    The claim of the '757 Patent is further invalid because it is not an "article of manufacture," but rather a component part.

193.    As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that the claim of the '757 Patent is invalid.

## COUNT XII – INVALIDITY OF THE '989 PATENT

194.    LKQ realleges and incorporates all preceding paragraphs as if fully set forth herein.

195.    At a minimum, the claim of the '989 Patent is invalid as obvious over the prior art.

196.    The claim of the '989 Patent is further invalid because it is not an "article of manufacture," but rather a component part.

197.    As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that the claim of the '989 Patent is invalid.

## COUNT XIII – INVALIDITY OF THE '963 PATENT

198.    LKQ realleges and incorporates all preceding paragraphs as if fully set forth herein.

199.    At a minimum, the claim of the '963 Patent is invalid as obvious over the prior art.

200.    The claim of the '963 Patent is further invalid because it is not an "article of manufacture," but rather a component part.

201.    As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that the claim of the '963 Patent is invalid.

## COUNT XIV – INVALIDITY OF THE '762 PATENT

202.    LKQ realleges and incorporates all preceding paragraphs as if fully set forth herein.

203.    At a minimum, the claim of the '762 Patent is invalid as obvious over the prior art.

204.    The claim of the '762 Patent is further invalid because it is not an "article of manufacture," but rather a component part.

205.    As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that the claim of the '762 Patent is invalid.

**COUNT XV – INVALIDITY OF THE '975 PATENT**

206.    LKQ realleges and incorporates all preceding paragraphs as if fully set forth herein.

207.    At a minimum, the claim of the '975 Patent is invalid as obvious over the prior art.

208.    The claim of the '975 Patent is further invalid because it is not an "article of manufacture," but rather a component part.

209.    As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that the claim of the '975 Patent is invalid.

**COUNT XVI – INVALIDITY OF THE '977 PATENT**

210.    LKQ realleges and incorporates all preceding paragraphs as if fully set forth herein.

211.    At a minimum, the claim of the '977 Patent is invalid as obvious over the prior art.

212.    The claim of the '977 Patent is further invalid because it is not an "article of manufacture," but rather a component part.

213.    As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that the claim of the '977 Patent is invalid.

## COUNT XVII – INVALIDITY OF THE '976 PATENT

214. LKQ realleges and incorporates all preceding paragraphs as if fully set forth herein.

215. At a minimum, the claim of the '976 Patent is invalid as obvious over the prior art.

216. The claim of the '976 Patent is further invalid because it is not an "article of manufacture," but rather a component part.

217. As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that the claim of the '976 Patent is invalid.

## PRAYER FOR RELIEF

WHEREFORE, LKQ prays for:

a. A declaration that LKQ has not infringed and is not infringing, directly or indirectly, the claim of the Non-Infringed Patents;

b. A declaration that the single claims of each of the Invalid Patents is invalid;

c. An order that Kia and each of its officers, employees, agents, attorneys, and any persons in active concert or participation with them are restrained and enjoined from further prosecuting or instituting any action against LKQ or the purchasers of LKQ's products claiming that the alleged patents are infringed or from representing that LKQ's products or their use on networks operated by purchasers of those products infringe the alleged patents;

d. A declaration that this is an exceptional case under 35 U.S.C § 285;

e. An award to LKQ of its costs and attorney's fees;

f. Such other relief as this Court or a jury may deem proper and just under the circumstances.

## **JURY DEMAND**

LKQ demands a trial by jury on all issues so triable.


Dated: June 11, 2021

Respectfully submitted,


*/s/ Barry F. Irwin, P.C.*

Barry F. Irwin, P.C.

Michael P. Bregenzer

**IRWIN IP LLC**

222 South Riverside Plaza

Suite 2350

Chicago, IL  60606

(312) 667-6080

birwin@irwinip.com

mbregenzer@irwinip.com

*Attorneys for Plaintiffs LKQ Corporation &*
*Keystone Automotive Industries*